UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
GP-UHAB Housing Development Fund
Corporation, Gates Patchen Tenants
Association and Dolores Morris                    CV-05-4830(CPS)

                 Plaintiffs,

        -against-                                 MEMORANDUM
                                                  OPINION AND ORDER
Alphonso Jackson, in his capacity
as Secretary for the Department of
Housing and Urban Development

                 Defendant.
--------------------------------X
SIFTON, Senior Judge.

        The GP-UHAB Housing Development Fund Corporation[1] ("GP-

UHAB"), the Gates Patchen Tenant Association,[2] and Dolores

Morris,[3] (collectively, the "plaintiffs"), bring this action

against Alphonso Jackson, in his capacity as Secretary for the

United States Department of Housing and Urban Development

("HUD"), claiming that HUD has illegally refused to continue

section 8[4] project based subsidies for the Gates Patchen

apartment complex. Plaintiffs allege four grounds for relief: (1)

that the Bond Amendment, Public Law 108-447, Div. I, Title II,

---

        [1] GP-UHAB Housing Development Fund Corporation is a not for profit
housing development fund corporation created pursuant to Article XI of the New
York Private Housing Finance Law. It has been the owner of the Gates Patchen
Apartments since July 21, 2005.

        [2] Gates Patchen Tenant Association is an unincorporated association made
up of the majority of the 76 families who live at Gates Patchen Apartments,
940-950 Gates Avenue, Brooklyn New York, 11221.

        [3] Dolores Morris resides at 950 Gates Avenue and is president of the
tenants association.

        [4] See the "Statutory Background" section below for an explanation of the
expressions "section 8" and "project-based" subsidies.

Sec. 211, 118 Stat. 3317, requires renewal of the project based subsidy; (2) that the Multifamily Assisted Housing Reform and Affordability Act ("MAHRAA") Section 524(a), Public Law 106-74, 113 Stat. 110, requires renewal of the project based subsidy; (3) that the United States Housing Act, 42 U.S.C. §1437f(t)(2), MAHRAA Section 524(d)(1), Public Law 106-76, 1113 Stat. 113, and HUD's internal procedures require the continuation of section 8 project subsidies until tenants are issued rent vouchers which may be used for other housing; and (4) that termination of the project based subsidy violates HUD's obligation to administer its programs "in a manner affirmatively to further the policies of the Fair Housing Act," ("FHA") 42 U.S.C. §3608(e)(5). Now before this Court is the plaintiffs' motion for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a) directing HUD to continue Section 8 project subsidies for the Gates Patchen Apartments, retroactive to September 1, 2005, pending the trial of this matter. Also before the Court is defendant's motion to dismiss the complaint for lack of standing under Article III of the United States Constitution and for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the plaintiffs' motion for a preliminary injunction is granted and defendant's motion to dismiss is granted in part and denied in part.

STATUTORY BACKGROUND

The Housing Choice Voucher Program, also known as the Section 8[5] program, is a federal program administered by HUD pursuant to the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974. *See* 42 U.S.C. §1437f. The Section 8 housing program was created "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. §1437f(a). HUD's rental subsidies allow eligible families, "to afford decent, safe and sanitary housing." 24 C.F.R. 981.1(a)(1).

Section 8 operates by providing federal subsides to private building owners who are willing to rent to low-income families. These owners enter into Housing Assistance Payment ("HAP") contracts with HUD. HUD then determines the maximum monthly rate the owners may charge as rent. Low income tenants who are eligible to receive section 8 assistance pay thirty percent of their adjusted gross income toward the HUD-set rent and HUD pays the balance. *See* 42 U.S.C. §1437f(c)(3), 42 U.S.C. §1437a(a)(1).

Section 8 assistance comes in two forms: (1) project based assistance, and (2) tenant based assistance. Project based assistance is dedicated to a specific apartment building or complex and is given directly to private landlords. Any tenant

---

[5] The name "section 8" is based on the fact that a predecessor of the current program was first created by section 8 of the United States Housing Act of 1937.

residing in that building is eligible to receive section 8 assistance. However, a tenant who leaves the building loses the subsidy. *See* 42 U.S.C. §1437f(d). In contrast, tenant based assistance comes in the form of a HUD-funded voucher. An eligible tenant may use the voucher to pay rent at any privately owned building that accepts such vouchers. *See*, 42 U.S.C. §1437f(o). However, a tenant may use the voucher only in an apartment that "meets housing quality standards for decent, safe, and sanitary housing [as] established by the Secretary [of Housing]." 42 U.S.C. §1437f(o)(5).

Generally, HUD must renew project based contracts when they expire. Section 524(a) of the MAHRAA provides that:

> upon termination or expiration of a contract for project-based assistance under section 8 . . . the Secretary of HUD shall, at the request of the owner . . . . use amounts available for the renewal of assistance under section 8 . . . to provide assistance for the project.

HUD may elect not to renew the contract only under limited circumstances delineated in Section 516(a) of the MAHRAA, which include "material adverse financial or managerial actions or omissions with regard to such project" or "with regard to other projects of such owner or purchaser that are federally assisted or financed with a loan from, or mortgage insured by, an agency of the Federal Government."

When a project based subsidy is not renewed, HUD must issue each tenant a portable voucher. Section 524(d)(1) of MAHRAA

provides that:

> In the case of a contract for a project based
> assistance under section 8 for a covered project that
> is not renewed under subsection (a) or (b) of this
> section (or any other authority), to the extent that
> amounts for assistance under this subsection are
> provided in advance in appropriation Acts, upon the
> date of the expiration of such contracts the Secretary
> shall make enhanced voucher assistance under section
> 8(t) of the United States Housing Act of 1937 (42
> U.S.C. §1437f(t)) available on behalf of each low-
> income family who, upon the date of such expiration, is
> residing in an assisted dwelling unit in the covered
> project.

The referenced sections of the United States Housing Act, 42

U.S.C. §1437f(t)(2) provide for issuance of individual tenant

vouchers upon, "the termination or expiration of the contract for

rental assistance under section 8 of the United States Housing

Act of 1937."

Special guidelines exist for the management and disposition

of multifamily housing projects owned by HUD or subject to a HUD

mortgage and are laid out in the Housing and Community

Development Amendments of 1978. 12 U.S.C §1701z-11. The goals of

that statute are set forth as follows:

(A) preserving certain housing so that it can remain
    available to and affordable by low-income persons;

(B) preserving and revitalizing residential
    neighborhoods;

(C) maintaining existing housing stock in a decent,
    safe, and sanitary condition;

(D) minimizing the involuntary displacement of tenants;

(E) maintaining housing for the purpose of providing
    rental housing, cooperative housing, and homeownership
    opportunities for low-income persons;

(F) minimizing the need to demolish multifamily housing projects;

(G) supporting fair housing strategies; and

(H) disposing of such projects in a manner consistent with local housing market conditions.

HUD has been granted wide discretion in the disposal of the multi-family properties it owns. Thus, Section 204, of the Departments of Veterans Affairs and Urban Development, and Independent Agencies Appropriations Act, 1997, as amended, 12 U.S.C. §1715z-11a, entitled "disposition of HUD-owned properties," provides as follows:

(a) Flexible authority for multifamily projects

During the fiscal year 1997 and fiscal years thereafter, the Secretary may manage and dispose of multifamily properties owned by the Secretary, including for fiscal years 1997, 1998, 1999, 2000, and thereafter . . . on such terms and conditions as the Secretary may determine, notwithstanding any other provision of law.

However, this discretion is limited in some circumstances. For example, The Bond Amendment, Consolidated Appropriations Act, 2005, Public Law 108-447, Div. I, Title II, Sec. 211, 118 Stat. 3317, provides that:

Notwithstanding any other provision of law, in fiscal year 2005, in managing and disposing of any multifamily property that is owned or held by the Secretary and is occupied *primarily* by elderly or disabled families, the Secretary of Housing and Urban Development shall maintain any rental assistance payments under section 8 of the United States Housing Act of 1937 that are attached to any dwelling units in the property. (emphasis supplied)

FACTUAL BACKGROUND

For purposes of defendant's motion to dismiss the allegations of the complaint are accepted as true and every inference drawn in plaintiffs' favor. For purposes of plaintiffs' application for a preliminary injunction, what follows sets forth this Court's findings of fact and conclusions of law as required by Rule 65(a) of the Federal Rules of Civil Procedure. The facts are drawn from the submissions of the parties in connection with both motions. They are undisputed.

The Gates Patchen Housing Apartments ("Gates Patchen"), the subject of this litigation, are comprised of two buildings, collectively containing 104 units, located at 940-950 Gates Avenue in the Bedford-Stuyvesant section of Brooklyn. As already noted, Gates Patchen is owned by the GP-UHAB Housing Development Fund Corporation and is a project based section 8 development. Until the recent developments discussed below, all of the units in Gates Patchen were subsidized through HUD's section 8 program with the tenants paying rent equivalent to 30 percent of their adjusted income to the landlord and HUD paying the remaining portion of the contract rents. In addition, HUD insured the property's forty year mortgage pursuant to the National Housing Act of 1934 ("NHA") codified at 12 U.S.C. §17151(d)(3). Gates Patchen's mortgage was insured under the 221(d)(3) BMIR (Below

Market Interest Rate) program.[6]

In 1971 the Gates-Patchen Housing Development Fund Co, Inc. ("GP-HDFC") acquired the property at 940-950 Gates Avenue from the City of New York as part of an Urban Renewal Plan. However, beginning in 1997 GP-HDFC allowed the project to fall into serious disrepair. When HUD inspected the premises in 2002, it scored 48 on the Real Estate Assessment Center (REAC)[7] scale, and in 2003 the inspection resulted in a REAC score of 15. A passing score is 60 out of 100.[8] To date the project has 631 Housing Code violations on record, of which 508 are "hazardous" or "immediately hazardous."

In 2003, GP-HDFC defaulted on its mortgage. HUD paid the $1.2 million mortgage insurance claim which resulted. Thereafter, HUD notified GP-HDFC and the tenants of the project that it intended to foreclose on the project. In May 2004, HUD placed

---

[6] The Below Market Interest Rate program provides subsidized financing to private developers of rental housing, through mortgages insured by the Federal government. 12 U.S.C. §17151(d)(3).

[7] According to its website, the "Real Estate Assessment Center's (REAC) mission is to provide and promote the effective use of accurate, timely and reliable information assessing the condition of HUD's portfolio; to provide information to help ensure safe, decent and affordable housing; and to restore the public trust by identifying fraud, abuse and waste of HUD resources." see, http://www.hud.gov/offices/reac/aboutreac.cfm

[8] The REAC inspection considers four categories: (1) the physical condition of a building; (2) the financial condition of a building (3) the management operations of a building; and (4) the resident service and satisfaction feedback on a building's operations. 24 C.F.R. §902.1. A passing score requires a building to obtain 60% of the possible points in each category. Thus, in order to pass, a building must obtain 60 of the 100 possible points. See e.g. 24 C.F.R. §902.25.

Gates Patchen in "regulatory default" because of the conditions on the premises and directed its enforcement center to begin the foreclosure process.

In early 2004, the Urban Homesteading Assistance Board[9] ("UHAB") began discussions with HUD and the City of New York regarding a possible transfer of the project to UHAB for conversion to low income cooperatives. In its February 2004 initial proposal to the City of New York,[10] UHAB requested the following: (1) that HUD acquire title to the property through purchase at the planned foreclosure sale; (2) that HUD sell the property to New York City for $10.00;[11] (3) that HUD provide 50% of the rehabilitation costs of the building to New York City; (4) that New York City convey the property and grant money to UHAB; (5) that UHAB manage the property for the tenants during the rehabilitation; (6) that upon completion of the rehabilitation the ownership be transferred to the tenants cooperative; and (7) that the project based section 8 contract, between HUD and the owners of Gates Patchen, be continued throughout the

---

[9] UHAB is a not-for-profit corporation that, "help[s] residents take control of distressed, neglected or abandoned buildings and enabling them to become co-operative home owners." see http://www.uhab.org/about/whatisuhab.htm. GP-UHAB is a subdivision of UHAB.

[10] The proposal was addressed to Jerilyn Perine, Commissioner of the Department of Housing Preservation and Development (HPD) and to Douglas Apple, General Manager of the New York City Housing Authority.

[11] In 2004 an appraiser hired by HUD valued the buildings at $3.4 million. The government maintains that this is the correct value. GP-UHAB did its own evaluation which produced a negative value for the building.

rehabilitation.

On March 5, 2004, the New York City Department of Housing

Preservation and Development ("HPD") forwarded UHAB's proposal to

HUD. On March 5, 2004, HUD responded to HPD's correspondence.

While indicating general amenability to UHAB's proposal, HUD

informed the City of New York that:

> Current HUD policy, for projects not predominantly
> occupied by elderly and/or disabled residents, is to
> maintain affordability by providing Section 8 vouchers.
> Therefore, HUD will provide funding for Section 8
> vouchers for all eligible tenants in lieu of project-
> based Section 8.

Def. Ex. C.

During the foreclosure proceeding and related litigation,

HUD repeatedly renewed Gates Patchen's section 8 contract at six

month intervals. The most recent renewal, for the period March 1,

2005 through August 31, 2005, was specifically renewed under

Section 524(a) of MAHRAA. Pl. Ex. C.[12]

On July 14, 2005, the City of New York wrote to HUD on

behalf of UHAB. In the letter the City acknowledged that the

Section 8 project funding would terminate when the property was

sold to NYC, but requested that the project based contract be

extended for six months after its expiration on August 31, 2005

to allow the NYC Housing Authority time to process tenant

---

[12] During oral argument the two sides disagreed whether or not such
payment, made after the transfer of Gates Patchen to GP-UHAB was made to GP-
UHAB, as plaintiffs contend, or to GP-HDFC, as defendant contends.

vouchers. Pl. Ex. E. The property changed ownership before HUD responded to the City's letter. Thereafter, HUD refused to grant the temporary extension.

On July 20, 2005, GP-HDFC offered its deed to HUD in lieu of foreclosure. HUD deeded the property to the NYC Housing Authority, who in turn conveyed it to GP-UHAB, a subsidiary of UHAB. Pursuant to the contract of sale, UHAB agreed to rehabilitate the project and turn it into low income cooperative apartments.

In September 2005, UHAB concluded that despite HUD's insistence that renewal was "contrary to policy," HUD was in fact required to renew the project based contract under Federal Law.[13] Accordingly, by letter dated September 28, 2005 UHAB requested the renewal of the project based contract pursuant to section 524(a) of MAHRAA. Pl. Ex. F. UHAB also requested that in the interim, subsidy payments be immediately resumed so that services could continue to be supplied to the tenants. On October 18, 2005 when GP-UHAB filed its motion for a preliminary injunction, HUD had not responded to UHAB's request. On October 20, 2005, HUD responded to GP-UHAB stating that HUD had sold the property to the City of New York with the explicit understanding that the

---

[13] The same federal law under which plaintiff now brings this suit. In other words, Section 524(a) of MAHRAA, the U.S. Housing Act, 42 U.S.C. §1437f(t)(2), Section 524(d)(1) of MAHRAA, HUD's internal procedures, the Fair Housing Act, 42 U.S.C. §3608(e)(5), and the Bond Amendment, Public Law 108-447.

project based section 8 contract would terminate.

At present only 76 of the 104 units in Gates Patchen are occupied. 100% of the occupants are African-American. 19 apartments are rented to senior occupants; 7 are rented to disabled occupants; 2 are rented to occupants who are both senior and disabled; 6 are rented to families with a disabled child; 1 is rented to an occupant with asthma.

Prior to the expiration of the section 8 contract the tenants in the 76 occupied apartments collectively paid $29,000 in rent and HUD provided $23,000 for a gross total rental income of $52,000. Pl. Ex. G. However, the average monthly operating costs for the project were approximately $65,000. The costs exceed the income because of the empty units. UHAB intended to cover the $13,000 monthly deficit with a construction loan. However, as of September 1, 2005, when the HUD subsidy was terminated, the project's monthly deficit jumped from $13,000 to $36,000. Plaintiffs predict that this winter's heating costs will average $20,000 per month.

HUD and the New York City Housing Authority have not begun to issue portable vouchers to the tenants of Gates Patchen. Even if such vouchers are issued, Section 8 vouchers may only be used in apartments which comply with Federal standards. Virtually none of the apartments in Gates Patchen comply with such standards in their current condition. Accordingly, the Gates Patchen tenants

would not be able to use their vouchers to pay rent on their current apartments but would be forced to secure new housing.


DISCUSSION

Standing

Standing exists where a plaintiff meets three conditions. First, the plaintiff must have suffered some "distinct and palpable injury." *In re Appointment of Indep. Counsel*, 766 F.2d 70, 73 (2d Cir. 1985). Second, the injury must be "the result of the 'putatively illegal conduct of the defendant.'" *Id*. (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)). In other words, a plaintiff must show that the injury "fairly can be traced to the challenged action." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Finally, it must be "likely that plaintiff's injury will be redressed by a favorable court decision." *Indep. Counsel*, 7666 F.2d at 74.

Defendant argues that plaintiffs lack standing because they have not met the second and third conditions. That is, they cannot show that their injury is the result of the defendant's illegal behavior, nor can they show that it is redressable. Defendant first argues that even if HUD is obligated to provide section 8 project funding (or at the very least, section 8 vouchers), HUD's failure to provide these funds is not the cause

of the tenant plaintiffs having to "endure uninhabitable conditions during the coming winter." Pl. Mem. 11-12. Defendant also argues that it is not the cause of an injury to GP-UHAB in the form of "the imminent collapse of its project, and the specter of being forced to violate its own mandate as a not for profit developer by managing a property without being able to provide essential services to its tenants." Rather, defendant alleges that GP-UHAB knew it would not receive project based funding and knew that individual tenants would not be able to use vouchers until the rehabilitation of the building was complete. Accordingly, defendant asserts that bad planning on the part of GP-UHAB is the cause of the harm.

However, defendant's argument is essentially not an argument for lack of standing, but rather, an argument that it will prevail on the merits. Plaintiffs assert that as a matter of law they are entitled to project based section 8 subsidies. Defendant has refused to provide such subsidies. Accordingly, defendant has caused financial harm, by refusing to provide money to which plaintiffs claim they are legally entitled. Plaintiffs have standing to make that argument.

Defendant further asserts that to the extent it did cause any harm, such harm cannot be redressed. Plaintiffs request that HUD "extend or renew the section 8 contract for their housing project." Pl. Mem. 1. Defendant claims that because no contract

has ever existed between HUD and GP-UHAB, the current owner,
there is no contract which is capable of being renewed. However,
as plaintiffs point out, HUD's own Section 8 Renewal Guide
provides that contracts may be renewed with a new owner following
a "transfer of physical assets", i.e. the sale of property. *See
e.g.* Renewal Guide, Appendix 5-1 at 5; Section 12-1C ("the
[project manager] should utilize all resources that are available
to restore full compliance, *including the proposed sale of the
property to a new Owner*." (emphasis added)). Accordingly,
plaintiffs' harm is redressable.

Motion to Dismiss Standard

Defendant argues that even if plaintiffs do have standing,
their claims must be dismissed under Federal Rule of Civil
Procedure, 12(b)(6), for failure to state a claim upon which
relief can be granted.

In considering a motion pursuant to Rule 12(b)(6), a court
should construe the complaint liberally, "accepting all factual
allegations in the complaint as true, and drawing all reasonable
inferences in the plaintiff's favor," *Chambers v. Time Warner,
Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)(citing *Gregory v. Daly*,
243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of
law or unwarranted deductions" need not be accepted. *First
Nationwide Bank v. Helt Funding Corp.,* 27 F.3d 763, 771 (2d
Cir.1994). "The issue is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. V. Town of Darien*, 56 F.3d 375,378 (2d Cir.1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80,83 (2d Cir.2000). A complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) if the Court finds that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Intern.,* 231 F.3d 82, 86 (2d Cir.2000).

Bond Amendment

Defendant argues that plaintiffs have failed to state a claim upon which relief can be granted under the Bond Amendment, because the Amendment does not apply in the circumstances presented here. The Bond Amendment, Consolidated Appropriations Act, 2005, Public Law 108-447, Div. I, Title II, Sec. 211, 118 Stat. 3317, provides that:

> Notwithstanding any other provision of law, in fiscal
> year 2005, in managing and disposing of any multifamily
> property that is owned or held by the Secretary and is
> occupied *primarily* by elderly or disabled families, the
> Secretary of Housing and Urban Development shall
> maintain any rental assistance payments under section 8
> of the United States Housing Act of 1937 that are
> attached to any dwelling units in the property.

(emphasis added). Defendant contends that Gates Patchen is not occupied *primarily* by disabled and elderly families.

Gates Patchen contains 104 units, of which only 76 are occupied. Of the 76 occupied units 28 are occupied by tenants who

are elderly or disabled and 48 are occupied by tenants who are neither disabled nor elderly.[14] Since plaintiffs' complaint alleges that less than a majority of the occupied apartments are rented to elderly or disabled families defendant concludes that the project is not occupied "primarily" by such families.

Where a statute does not define a relevant term, as is the case here, a court looks to its ordinary meaning. *see e.g. Rousey v. Jacoway*, 125 U.S. 1561, 1562 (2005). This may include the use of dictionary definitions. *Id.* The Merriam-Webster's Dictionary, 9th Edition, on which both sides rely, defines the word, "primarily" as "for the most part; chiefly," and defines the word "chiefly" as "most important; principally, especially." The Oxford English Dictionary, 3rd Edition, defines primarily as, "in the first place, first of all, pre-eminently, chiefly, principally, essentially."

No legislative history defines the meaning of the word "primarily" as used in this statute, nor does any "purpose"

---

[14] The United States Housing Act and its regulations implementing the section 8 program define the terms "disabled family" and "elderly family" as follows:

> Disabled family means a family whose head, spouse, or sole member is a person with a disability.

> Elderly family means a family whose head, spouse, or sole member is a person who is at least 62 years of age.

29 C.F.R. §5.403; 42 U.S.C. 1427a(b)(3).

Plaintiffs list of disabled and elderly families lists 34 disabled or elderly families. However, this tally includes six families who have disabled children. Such families are not disabled families for the purpose of the statute because their head of the household or spouse is not disabled.

section shed light on Congress's intent in using the expression.[15]

In the present case "primarily" must be applied to a division between two relevant groups: (1) tenants who are either disabled or elderly, and (2) tenants who are neither disabled nor elderly. In other relevant respects, such as race and economic situation, there appears no difference between the two categories.[16] As between only two groups, only one group can be the "most important," "first," "primary," "principal," or "chief" group. Accordingly, in the present case, the ordinary meaning of the statute requires that the building be viewed as not "primarily" occupied by elderly or disabled families.

Although the meaning of "primarily" in the Bond Act has not been explored in other cases, other legal contexts support a definition of "majority" in the context of this case. For

---

[15] The relevant language is mentioned only twice in the legislative history Conference Report on H.R. 4818, Consolidated Appropriations Act, 2005, 150 Cong.Rec. H10235-01, at H10373, H10845. However, no comment is made on the meaning of the word "primarily" nor is there any discussion of the provision's purpose.

[16] Arguably the two groups also differ in terms of need, with the needs of the elderly and disabled being more important than those of who are younger and able. However, if this is what Congress intended, then the word "primarily" would serve no purpose since in any situation in which a tenant was elderly or disabled the Bond Amendment would not permit an alteration of existing rental assistance requirements. Because "a cardinal doctrine of statutory interpretation" is that courts are "obliged to give effect to every clause and word of a statute," the Bond Amendment should not be interpreted in a manner which would render the word "primarily" meaningless. *Union of Needletrades and Textile Employees, AFL-CIO, CLC v. U.S. Immigration and Naturalization Service*, 202 F.Supp. 2d 265, 271 (S.D.N.Y. 2002)(citing *U.S. v. Menasche*, 348 U.S. 528 (1955)).

example, in the bankruptcy context, debt is defined as primarily consumer debt when more than half of the debt is consumer debt. See e.g. *In re Stewart* 175 F/3d 796, 808 (10th Cir. 1999); *In re Kelly*, 841 F.2d 908,913 (9th Cir. 1988). Similarly, Department of Labor regulations state that "a good rule of thumb [is] that primary duty means the major part, or over 50 percent." 29 CFR §541.103.

Thus, taking all the facts in the complaint to be true, plaintiffs cannot prevail on this claim, because it is barred as a matter of law. Accordingly this claim must be dismissed.

MAHRAA

Plaintiffs claim that Section 524(a) of the MAHRAA requires HUD to renew their project based section 8 subsidy. Section 524(a) of the MAHRAA requires in relevant part that:

> upon termination or expiration of a contract for
> project-based assistance under section 8 for a
> multifamily housing project . . . the Secretary shall,
> at the request of the owner of the project . . . use
> amounts available for the renewal of assistance under
> section 8 of such Act to provide such assistance for
> the project.

Under this section, renewal may be denied only under circumstances delineated in Section 516(a) of the MAHRAA, which applies to owners who have engaged in "material adverse financial or managerial actions." Defendant does not allege that plaintiffs have engaged in any such action.

Rather, defendant claims that Section 534(a) is preempted in

this case by Section 204 of the Departments of Veterans Affairs
and Urban Development, and Independent Agencies Appropriations
Act, 1997, as amended, 12 U.S.C. §1715z-11a, which grants HUD
authority to determine the terms and conditions of its
disposition of multifamily properties, such as Gates Patchen,
which are owned by HUD. Section 204, entitled "disposition of
HUD-owned properties," provides as follows:

(a) Flexible authority for multifamily projects

> During the fiscal year 1997 and fiscal years
> thereafter, the Secretary may manage and dispose of
> multifamily properties owned by the Secretary,
> including for fiscal years 1997, 1998, 1999, 2000, and
> thereafter . . . on such terms and conditions as the
> Secretary may determine, notwithstanding any other
> provision of law.

In deciding which of two conflicting statues applies in
specific case, a court must again attempt to discern Congress's
intent guided in this endeavor by various principles of
interpretation. Two[17] are applicable here. The first of these
principles mandates that when Congress uses the language

---

[17] A third principle of interpretation, mandating that "where there is
no clear intention otherwise, a specific statute will not be controlled or
nullified by a general one, regardless of priority of enactment" is not of use
here. *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (holding that the Equal
Opportunities in Employment Act of 1972 did not nullify the earlier Indian
Reorganization Act of 1934 which specifically provided for an employment
preference for Indians in the Bureau of Indian Affairs.) In this case it is
not possible to determine which is the more specific statute and which is the
more general statute. On one hand, the MAHRAA provision is generally
applicable to all Section 8 project funding. HUD owned properties are only a
subset of Section 8 project funded properties. On the other hand, the
"flexible authority" provision is a generally applicable rule for all HUD
owned housing. Section 8 project funded housing is only a subset of all HUD
owned properties.

"notwithstanding any other provision of law" the court must
assume that Congress meant what it said, and that the law governs
even when it would violate other applicable statutes. Thus, a
"notwithstanding" clause preempts contradictory provisions in the
same contract or statute, see e.g. *Cisneros v. Alpine Ridge*, 508
U.S. 10 (1993)(holding that in a contract between HUD and private
landlords, the clause providing for automatic annual rent
increases was preempted by a clause stating that "notwithstanding
any other provisions of the contract" adjustments shall not
result in a difference between subsidized rents and unsubsidized
rents. The court concluded that "a clearer statement [of
Congressional intent] is harder to imagine"); *Auburn Housing
Auth. v. Martinez*, 277 F.3d 138 (2d Cir. 2000)(holding that where
two statutes were enacted on the same day, the "notwithstanding"
provision in one mandated that its provisions govern). *see e.g.*
*Springs v. Stone*, 362 F.Supp. 2d 686, 698 (E.D.Va. 2005) ("It
matters not whether the conflicting provisions are in the same
statute or a different one; a 'notwithstanding' clause as broad
as the one used here by Congress provides a blanket exception").

However, a second rule of statutory interpretation mandates
that the most recently enacted statute must govern because it is
the most recent indication of Congress's intent. *In re Ionosphere
Clubs, Inc.,* 922 F.2d 984, 991 (2d Cir. 1990) (stating the rule
that, "when two statutes are in irreconcilable conflict, we must

give effect to the most recently enacted statute since it is the most recent indication of congressional intent.") This may be true even where the earlier statute contained a "notwithstanding" clause and the more recently enacted statute did not. *In re Morrissey,* 717 F.2d 100, 103 (3rd Cir. 1983)(holding that the "pervasive applicability" of 28 U.S.C. §636(c)(1) allowing magistrate judges to conduct all proceedings in civil matters when designated to do so by the district court "notwithstanding any other provision of law" was limited by the subsequently enacted 28 U.S.C. §1334c prohibiting magistrates from presiding over bankruptcy actions); *In re Global Crossing Ltd. Securities Litigation*, 2003 WL 21659360 (S.D.N.Y. 2003). According to this rule of interpretation, since the "flexible authority" provision was set forth as part of an appropriations bill, Public Law 104-204, in 1996 and Section 524(a) of MAHRAA requiring renewal of project based contracts was enacted a year later, on October 27, 1997, the MAHRAA provision is the most recent indication of Congress's intent, and must control.

However, the annual appropriation acts for fiscal years 2001 through 2004 (all enacted after the MAHRAA) contain language explicitly limiting HUD's flexible authority under section 1715z-11a(a). See Pub. L. No. 106-377, Sec. 233, 114 Stat. 1441A-1; Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Resolution 2003, Pub. L.

No. 107-73, Sec. 212, 115 Stat. 651; Consolidated Appropriations
Resolution 2003, Pub. L. No. 108-7, Sec. 213, 117 Stat. 11;
Consolidated Appropriations Act 2004, Pub. L. No. 108-99, Sec.
212, 118 Sec. Stat. 3; Consolidated Appropriations Act, 2005,
Division I, Title II, Pub. L. No. 108-447, Sec. 211, 118 Stat.
3317.  In those bills Congress provided that "notwithstanding any
other provision of law," when HUD disposes of multifamily
properties that are "occupied primarily by elderly or disabled
families" HUD must maintain project based funding. Had Congress
believed that the MAHRAA mandated automatic renewal of project
based funding for all HUD owned properties in spite of section
1715z-11a(a) it would not have needed to specify that project
based funding must be renewed in properties occupied primarily by
elderly or disabled families. Thus, Congress had made clear its
intent that the MAHRAA does not preempt section 1715z-11a(a).
Accordingly, plaintiffs have no legal entitlement to the
extension of project based funds and can prove no set of facts
which would entitle them to relief. This claim must accordingly
be dismissed.


Temporary Extension of Project Based Funding

     Plaintiffs argue that even if they are not entitled to a
permanent extension of Section 8 project funding, they are
entitled to a temporary extension of such funding until

individual vouchers can be provided to all tenants of Gates

Patchen under Section 524(d)(1) of MAHRAA, which states:

> In the case of a contract for a project based
> assistance under section 8 for a covered project that
> is not renewed under subsection (a) or (b) of this
> section (or any other authority), to the extent that
> amounts for assistance under this subsection are
> provided in advance in appropriation Acts, upon the
> date of the expiration of such contracts the Secretary
> shall make enhanced voucher assistance under section
> 8(t) of the United States Housing Act of 1937 (42
> U.S.C. §1437f(t)) available on behalf of each low-
> income family who, upon the date of such expiration, is
> residing in an assisted dwelling unit in the covered
> project.

The referenced subsection of the United State Housing Act, 42

U.S.C. §1437f(t)(2) provides for issuance of individual tenant

vouchers upon, "the termination or expiration of the contract for

rental assistance under section 8 or the United States Housing

Act of 1937." Defendant correctly argues that, as discussed

above, HUD is not bound by the provisions of the MAHRAA because

of its flexible authority under section 1715z-11a(a).

However, when project based funding is not renewed defendant

is obligated to provide individual vouchers to each tenant under

its own policies. Indeed, for the duration of the discussions

between HUD and GP-UHAB, HUD maintained that it would not provide

project based funding because it is "HUD's policy . . . to

terminate project-based Section 8 assistance and move to tenant-

based assistance upon the sale of our properties." Def. Ex. I.;

Def. Ex. C.; Def. Ex. D. Further, HUD's own Renewal Guide

requires that, "to assure adequate processing time, the process of providing tenant-based assistance should begin 120 days before the expiration of the project-based contract." Renewal Guide, Section 8-1(B), 12-1(D)(2).

It is undisputed that the Gates Patchen tenants have not received individual section 8 vouchers. HUD's internal procedures mandate that "[i]f there is a delay in the provision of tenant based assistance, [HUD must] offer the owner a short term contract." Thus, because the tenants have not received individual vouchers, HUD is obligated, under its own procedures, to offer a short term project based contract."  It is of no consequence that HUD's internal procedures are more rigorous than those mandated by its flexible authority under section 1715z-11a. Rather, "it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235 (1976); *Accord Bergamo v. CFTC*, 192 F.3d 78, 79 (2d Cir. 1999); *Smith v. Resor,* 406 F.2d 141, 145 (2d Cir. 1969) ("where the agencies have laid down their own procedures and regulations, those procedures and regulations cannot be ignored by the agencies themselves even where discretionary decisions are involved.")

HUD argues that its internal regulations are not applicable in the present case because the referenced sections of the

Renewal Guide apply only when HUD decides to terminate its contract for project based financing with a current owner because of deteriorating conditions of the property which the owner refuses to fix. The regulations mandate that HUD "utilize all resources available to restore full compliance" so that project based subsidies can continue. Such resources include, "the proposed sale of the property to a new owner." Thus, the regulations apply to a new owner who takes over a deteriorating project, as in the present case.

GP-UHAB can therefore prove a set of facts which would entitle them to relief. Accordingly, defendant's motion to dismiss the complaint in its entirety must be denied.

Fair Housing Act

The Federal Fair Housing Act (Title VII of the Civil Rights Act of 1968) declares as "policy" the provision of fair housing throughout the United States. 42 U.S.C. §3601. In addition to substantive provisions prohibiting discrimination related to the rental or sale of places of dwelling, 42 U.S.C. §§3604-3606, it instructs the Secretary of Housing and Urban Development to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this [Act]. 42 U.S.C. §3608(2)(5). This provision has been enforced under the Administrative Procedures Act ("APA"). *See, N.A.A.C.P. v. Secretary of Housing and Urban Development*,

817 F.2d 149 (1st Cir. 1987), on remand, 721 F.Supp. 361 (D. Mass. 1989). Title VIII of the Fair Housing Act requires HUD to actively assist in ending discrimination and segregation and promoting an increase in the supply of genuinely open housing. *Id.* Plaintiffs contend that HUD's refusal to renew a Section 8 contract for a project housing exclusively African-American families violates Title VIII and the general policies of the Fair Housing Act.

Defendant asserts (1) that it has not violated the FHA, and (2) that it is not bound by these provisions in the present case because they are preempted by the "flexible authority" provision discussed above. As discussed there, absent an indication of congressional intent to the contrary, the general rule is that the more recently enacted statute must control, *Ionosphere*, 922 F.2d at 991. Title VIII was enacted in 1968. The flexible authority provision was enacted in 1996. Thus, the Title VIII provision is trumped by the more recent "flexible authority" provision. Accordingly, the plaintiffs' Fair Housing Act claims are barred as a matter of law and must be dismissed.


Preliminary Injunction Standard

Plaintiffs have requested a preliminary injunction requiring HUD to extend the project based subsidy pursuant to Federal Rule of Civil Procedure 65(a) pending the trial of this matter.

The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits.[18] *See WarnerVision Entm't v. Empire of Carolina, Inc.,* 101 F.3d 259, 261-62 (2d Cir. 1996). Because it is "one of the most drastic tools in the arsenal of judicial remedies," *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir. 1985), a preliminary injunction is an extraordinary measure that should not be routinely granted. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).

In order to obtain a preliminary injunction, plaintiffs must demonstrate: (1) the possibility of irreparable harm; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the plaintiffs.[19] *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 24 (2d Cir. 2000). To show a likelihood of success on the merits, plaintiffs "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent.'" *BigStar Entm't v. Next Big Star Inc.,* 105

---

[18] Accordingly, only those claims not already dismissed are addressed below.

[19] The parties each put forth arguments as to whether where, as here, an injunction is sought to prevent government action the more difficult "likelihood of success" prong must be satisfied. As the plaintiffs are able to meet the likelihood of success prong on those claims which have survived the motion to dismiss, it is not necessary to decide if the "sufficiently serious questions" prong would be an available basis for the grant of a preliminary injunction.

F.Supp.2d 185, 191 (S.D.N.Y. 2000) (quoting *Wali v. Coughlin,* 754
F.2d 1015, 1025 (2d Cir. 1985)).

Success on the Merits

Plaintiffs claim that they have a likelihood of success on
the merits in regard to their claim that defendant was and is
obligated to extend the project based subsidy temporarily until
tenants receive individual vouchers under internal HUD
regulations. Internal HUD policies mandate that tenants must be
given individual vouchers when project based funding is not
continued and that if there is a delay in the provision of tenant
based assistance HUD must temporarily extend the project based
assistance. It is undisputed that the project based funding has
neither been renewed nor extended. It is undisputed that tenants
are entitled to individual voucher assistance and that the
tenants have not received such vouchers. Accordingly, plaintiffs
have shown a likelihood of success on this claim.

Irreparable Harm

The plaintiffs have also succeeded in showing irreparable
harm. "To establish irreparable harm, the movant must demonstrate
'an injury that is neither remote nor speculative, but actual and
imminent' and that cannot be remedied by an award of monetary
damages." *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d
Cir. 1995)(quoting *Tucker Anthony Realty Corp. v. Schlensinger*,
888 F.2d 969, 975 (2d Cir. 1989).

*Tenant Plaintiffs*

Tenant plaintiffs assert that without a preliminary injunction extending the project based financing, they will be denied the basic necessities of life. Without a HUD subsidy the project's income has decreased from $52,000 to $29,000 per month. Heating costs in the winter month average $20,000. Without a project based subsidy GP-UHAB will be unable to provide the basic necessities, including heat, to its tenants.

Nor do these tenants have the option of leaving Gates Patchen. The tenants have not been issued individual section 8 vouchers. None of the low-income tenants can afford to rent an apartment at market value. Accordingly, the tenants are trapped in Gates Patchen and forced to live in an unheated building in the absence of support from the defendant.

At oral argument, defendant suggested for the first time that GP-UHAB could tap into its private grant money to pay heating bills. The facts with regard to this private grant money are not developed in the papers and if GP-UHAB uses funds earmarked for renovations necessary in order to make the dilapidated apartments habitable the apartments will deteriorate further or remain in their present state. Without HUD funds the plaintiffs will be forced to choose between heat and habitable apartments. The lack of either constitutes irreparable harm.

Defendant also argues that GP-UHAB's inadequate preparation

and financing is the cause of the heating crisis and that in any event to the extent HUD owes plaintiffs any money, such liability is only a financial harm which can be remedied by money damages. *see e.g. Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982)(holding that plaintiff failed to show irreparable harm where the alleged harm was strictly financial).

This argument borders on the cruel. Even if GP-UHAB or some other non-profit might have remedied the current situation, the individual tenants are in no way at fault. Section 8 funding is mandated precisely in order to guarantee livable housing to low income tenants. Tenants undisputably have a right either to project based funding or to individual vouchers. Because they have received neither they will have no choice but to remain in an inadequately heated complex. The current situation at Gates Patchen may thus be attributed, among other things, to HUD's failure to comply with its legal obligations. HUD is not absolved or its responsibility even if GP-UHAB is considered partially responsible. *See e.g. Proetta v. Dent*, 484 F.2d 1146, 1149 (2d Cir 1973).

*Institutional Plaintiff*

As plaintiffs have clearly demonstrated irreparable harm to the tenants, it is not necessary to separately determine whether the institutional plaintiff has also suffered such harm since the requested relief will be granted in any case.

CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted. Defendant's motion to dismiss is granted in part and denied in part.

The clerk is directed to furnish a copy of the within to the parties.


SO ORDERED.


Dated :    Brooklyn, New York

           February 7, 2006


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge